1

2

3

4

5

6

7

8                    **IN THE UNITED STATES DISTRICT COURT**

9                  **FOR THE EASTERN DISTRICT OF CALIFORNIA**

10

11   SABU SHERVON McCRAY,                    No. CIV S-06-0485-GEB-CMK-P

12                   Petitioner,

13          vs.                              <u>FINDINGS AND RECOMMENDATIONS</u>

14   SCOTT KERNAN, et al.,

15                   Respondents.

16   _____/

17               Petitioner, a state prisoner proceeding with appointed counsel, brings this petition

18   for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 challenging the denial of parole in

19   February 2005.  Pending before the court are petitioner's pro se petition for a writ of habeas

20   corpus (Doc. 1), respondents' answer (Doc. 15), and petitioner's pro se reply (Doc. 17).  Also

21   before the court are the following s filed after the appointment of counsel:  petitioner's

22   supplemental memorandum and exhibits (Docs. 34 and 35), respondents' supplemental answer

23   (Doc. 41), and petitioner's supplemental reply (Doc. 45).  Pursuant to the court's March 26,

24   2008, order, petitioner filed a supplemental brief (Doc. 47).  Respondents request a stay of

25   proceedings in this case (Doc. 48) pending issuance of the mandate in <u>Hayward v. Marshall</u>,  512

26   F.3d 536 (9th Cir. 2008), <u>rehearing en banc granted</u>, 527 F.3d 797  (9th Cir. 2008).

                                            1

# I. BACKGROUND

A.    **The Commitment Offense, Conviction, and Sentence**

Petitioner and respondents refer to the Board of Prison Terms' ("Board") February 9, 2005, hearing decision for a description of the facts of petitioner's commitment offense. Petitioner summarizes those facts as follows:

> Petitioner, Sabu McCray, was eighteen years old in 1984 when he and an older accomplice [Reginald Martin] attempted to rob a Kentucky Fried Chicken restaurant just after it closed to business. Frustrated when the manager did not have the combination to the safe, they forced her into her car, tied her hands with duct tape, and drove off. An alert deputy sheriff heard the manager scream and took up pursuit, catching petitioner and his accomplice, who surrendered immediately.

Citing to the transcript of February 2005 hearing, which is attached to respondents' answer as Exhibit B, respondents describe the facts in a bit more detail:

> The circumstances of McCray's crimes are as follows: While on parole from the California Youth Authority, McCray and a crime partner conspired to commit a late night robbery of a fast food restaurant and its employees. (Ex. B at 48, 67-68). In furtherance of the conspiracy, the two gathered up weapons, ski masks and a roll of duct tape. (*Id*. at 68, 70). On December 3, 1984, at approximately 10:00 p.m., McCray and his crime partner donned their ski masks and confronted restaurant employees at gun-point. (*Id*. at 67-68). They ordered the employees to lie face down on the floor and forced them to hand over their wallets. (*Id*.). McCray was identified as one who then ordered the female restaurant manager to open the combination lock to the restaurant's safe. (*Id*. at 68). The manager told McCray that she did not know the combination to the safe. (*Id*. at 68- 69). Apparently angered, McCray and his crime partner decided to take the manager as a hostage. (*Id.* at 70).
> Using a hat and some duct tape, they blind-folded the manager. (Ex. B at 70). Thereafter, McCray and his crime partner confiscated the manager's car keys so that they could use her car to further their escape. (*Id*.). Meanwhile, a sheriff's deputy, driving by the restaurant, became suspicious when he failed to see the usual sight of employees cleaning up the restaurant around the 10:00 p.m. hour. (*Id*. at 70-71). To clear up his suspicions, the deputy tapped on the restaurant window to draw attention, but he got no response. (*Id*. at 71). While the deputy was on the front-side of the restaurant, behind it McCray and his crime partner were busy loading the blind-folded manager into the car. (*Id*.). Fearing for her life, the manager screamed "help" before she was forcefully shoved head-first into the front seat of the car. (*Id*.). Alerted by the scream, the deputy radioed dispatch for assistance and began a pursuit of the get-away car. (*Id*. at 70-71). McCray then advised his crime partner (the get-away car driver), "that's a cop behind us. Make sure you stop at all stop signs, be

1  
2  
3  
4  
5

cool where you're going and what's your doing." (*Id*. at 71-72).  During the car chase, the driver held the manager's head down and out-of-view by pressing his elbow to her head. (*Id*. at 71).  Following a ten to fifteen minute car chase, that involved two law enforcement agencies, McCray and his crime partner were apprehended while the manager was rescued. (*Id*. at 72).  At the time of his arrest, McCray was in possession of a handgun and a roll of duct tape. (*Id*.).  McCray does not dispute the facts of his crimes. (*Id*. at 14).

6   Petitioner was convicted in 1985 of kidnaping to commit robbery, attempted robbery, and auto

7   theft.  With enhancements for use of a firearm, petitioner was sentenced to an indeterminate

8   sentence of life with the possibility of parole.  According to petitioner, he first became eligible

9   for parole in 1993.

10      **B.      Parole Suitability Hearings**

11      Petitioner has had at least nine parole suitability hearings.[1]  Petitioner's initial

12   parole suitability hearing was held on February 14, 1992, at which time the Board denied parole.

13   Petitioner states that the Board could not provide his counsel a copy of the transcript from the

14   1992 hearing.

15      February 1994 Hearing

16      A second (or first subsequent) hearing was held on February 11, 1994.  The Board

17   denied parole, concluding that petitioner would pose an unreasonable risk of danger to society if

18   released.  The Board cited the following factors in support of its decision:  (1) the facts of the

19   commitment offense; (2) petitioner's prior criminal and social history; (3) petitioner's history of

20   disciplinary actions while in prison; (4) petitioner's failure to upgrade educationally and

21   vocationally; (5) petitioner's failure to participate in self-help programs; and (6) petitioner's

22

23  
24  
25

[1]      Petitioner's initial hearing was in 1992.  He then had eight subsequent hearings. In this case, he challenges the seventh subsequent hearing held in 2005.  Petitioner states that he appeared before the Board in March 2006 for an eighth subsequent hearing, at which time parole was again denied.  It is unclear whether any suitability hearings have been held since March 2006.

26      Petitioner's appointed counsel stated that he attempted to obtain copies of all Board decisions, but that some transcripts could not be located by the Board.

1   January 1994 psychological evaluation.  As to misconduct while in prison, the Board noted that

2   petitioner has received nine "CDC 115" disciplinary charges since his arrival in prison, the most

3   recent of which occurred on June 15, 1993.  The Board recommended that petitioner complete

4   "necessary programming which is essential to his adjustment" and concluded that he needed

5   more time to complete such programming.  The Board also recommended that petitioner

6   "become disciplinary free."  The presiding commissioner concluded the 1994 hearing by saying:

7               That's the first step, Mr. McCray.  The first step is staying
            disciplinary free.  If you can make that step, the other steps will follow.
8           Remember what I said, when you put enough stuff in the file that will
            support a parole date, that's when you get it.

9

10          May 1996 Hearing

11              Petitioner next appeared before the Board for a suitability hearing in May 1996.

12  Again, the Board denied parole.  The Board cited the following factors:  (1) the facts of the

13  commitment offense; (2) petitioners prior criminal and social history; (3) petitioner's failure to

14  participate in sufficient self-help programming; (4) recent disciplinary violations.  As to

15  disciplinary infractions, the Board noted that petitioner tested positive for marijuana since his last

16  suitability hearing.  The Board did, however, commend petitioner "for his work ethic and his AA

17  participation."  The presiding commissioner stated:  "If you continue to get 115's, you're going to

18  continue to stay in prison."  Deputy Commissioner Douglas concluded the hearing by adding:

19              . . . I think you've got your foot in the right path now and, you
            know, you've [got] to realize that the longest journey starts with the first
20          step.  And that's where you're at.  Good luck to you.

21          August 1998 Hearing

22              Petitioner was again considered for parole in August 1998.  The Board denied

23  parole, citing many of the same factors.  In particular, the Board noted that petitioner "has not, as

24  of yet, completed a vocation."  The Board, however, noted that petitioner had made progress

25  educationally, having obtained his GED.  The Board also noted that petitioner had not received

26  any new disciplinary infractions and recommended that he "remain disciplinary free."

                                                4

May 2001 Hearing

Petitioner's next suitability hearing was in May 2001.  The Board noted that petitioner had not committed any disciplinary violations since 1995 and that petitioner had received excellent work evaluations and had continued to participate in AA and NA.   The Board also addressed a June 2000 psychological evaluation, noting that the psychologist had concluded that petitioner "truly gained some maturity and perspective of the event and does not show ongoing criminality as part of his view toward life and his future."  The psychologist assessed petitioner's risk level as "below average."  The Board denied parole, but said that petitioner would be reviewed again in one year.  In its decision, the Board again cited unchanging factors and added that petitioner had wasted his first ten years in prison.  The Board also noted that petitioner's letters in support of parole were a few years out of date.  Commissioner Granlund concluded the hearing by saying:

> . . . I think you're on the right track.  You're making progress. You've gotten to a point where you realize you don't – I believe you don't want to spend the rest of your life here, you want to get out, and I believe that we've tried to lay some of that plan out for you of exactly what you're going to have to do because you really can go to work now on getting a parole date by having those plans in place and if you can upgrade any more in any other vocation or, you know, anything else that you can do along those lines.

May and August 2002 Hearings

Petitioner was next considered for parole at hearings held in May and August 2002.  In denying parole, the Board once again relied on the facts of petitioner's commitment offense, prior criminal history, and social history.  The board also cited a March 15, 2002, psychological report which "showed some promise, but . . . raised some concerns."  The psychologist stated that it was difficult to assess petitioner's degree of risk to the community if released and observed that, if petitioner returned to drug use, his risk would be "greatly increased."  However, the psychologist "didn't really want to go out on a limb and give an assessment in terms of whether the prisoner would be a risk of danger to society."  Based on this,

1  the Board decided to order a new psychological evaluation.  As to positive factors, the Board

2  noted that petitioner had not committed any disciplinary infractions for seven years, that he had

3  obtained job skills, and had an impressive resume.  Specifically, the Board stated:

4              . . . [T]here are things that we want to commend this prisoner for:
            outstanding work reports, outstanding comments from his supervisor, as
5           well as his instructor in the vocational laundry.  It appears that the prisoner
            is an excellent worker.  He's dependable now.  It appears that he sets a role
6           model in the work place for other inmates.  And we certainly want to
            commend him for that.  He started a disciplinary [free] streak that the
7           Board finds impressive.  That he hasn't received a disciplinary since July
            6th, 1995.  And we certainly want to commend him for that.

8

9  Notwithstanding these positive factors, the Board found that "those positive aspects of his

10  behavior [do] not outweigh the factor[s] of unsuitability."  The Board also noted that petitioner's

11  accomplice in the crime had been granted parole and told petitioner that parole was indeed

12  possible "on this very particular crime because Reginald Martin is going home today. . . ."

13              October 2003 Hearing

14              The Board considered petitioner's case again in October 2003.  By this time,

15  petitioner had obtained vocational certifications for washroom technician and laundry

16  management.  Commenting on his promotion to the lead position in the prison laundry, the Board

17  noted that petitioner had demonstrated "exceptional skill and knowledge in leadership qualities"

18  and had "expressed an outstanding attitude towards staff and co-workers."  Petitioner's

19  supervisor reported that petitioner was highly motivated.  In addition, the Board noted that

20  petitioner had remained free of disciplinary violations since 1995.  Petitioner had also continued

21  his participation in AA and NA and the staff sponsor reported to the Board that petitioner was

22  "wholehearted."  Petitioner's correctional counselor prepared a report assessing petitioner's risk

23  of danger as "minimal, at this time based on McCray's observed behavior in the preceding eight

24  or nine years."  The counselor also stated in his report as follows:

25              . . . I have noticed a tremendous change in him since his early
            days . . . in C facility.  I feel the days of his reckless youth have been
26           placed in the past and he is a more matured motivated individual. . . .  I

6

> have had other occasions to observe McCray when his patience was put to
> the test. . . .  McCray has met his challenge by keeping composure,
> continuing his . . . positive program, and maintaining good work ethics.

The counselor noted that petitioner had lowered his placement score by 64 points and stated that this accomplishment was "truly praiseworthy."  The counselor concluded by stating:  "I highly recommend McCray . . . be paroled at this time."

In its 2003 decision to again deny parole, the Board continued to rely on the unchanging factors of the facts of the commitment offense and petitioner's prior criminal and social history.  The Board also cited the inconclusive 2002 psychological evaluation.[2]  In denying parole, the Board stated:

> . . . The Panel makes the following findings:  That your gains are
> recent and you must demonstrate an ability to maintain your gains for an
> extended period of time.  However, the Panel has really (indiscernible) by
> the fact that you have been disciplinary free since 1995, and the
> laudatories and all the comments that have come to you from your
> correctional counselor, from your supervisors in PIA talking about your
> exceptional work in all areas, your skill and knowledge, your attitude, your
> interaction with staff are really to be commended.  However, these positive
> aspects of your behavior do not outweigh your facts of unsuitability.

The Board denied parole but indicated it would review plaintiff's case again in one year.  In the meantime, the Board directed that a new psychological evaluation be completed to "specifically address . . . the prisoner's violence potential in a free community, significance of alcohol or drugs as it related to the commitment offense, and an estimate of the [prisoner's ability] to refrain from the use and abuse upon release. . . ."  The Board wanted to see petitioner make progress over a great amount of time "to show that you really have turned around and you can be violence free."

/ / /

/ / /

/ / /

/ / /

---

[2]      No new evaluation was conducted for the 2003 hearing.

February 2005 Hearing

On February 9, 2005, the Board conducted a seventh parole suitability hearing. Citing to Exhibit G to petitioner's supplemental brief, petitioner's appointed counsel outlines the hearing in detail.  The court accepts counsel's summary, which is as follows:[3]

> On February 9, 2005, petitioner has his seventh parole suitability hearing.  The Board reviewed the facts of the commitment offense and petitioner's criminal history.  The Board discussed his social history, including his lack of any substance abuse outside prison and his continuing relationships with family.
> The Board noted petitioner obtained his GED in 1997, and that he had continuous AA/NA attendance for several years.  The evidence showed that petitioner had established an impressive work record in prison, consistently obtaining "exceptional" work evaluations while he moved from a daily worker to lead man in the laundry.  The superintendent of the laundry, Jim Livingston, supervises both staff and prisoners who work in the laundry.  He wrote a letter supporting petitioner.  He noted that in seventeen years as a superintendent, he had never written a laudatory letter for a prisoner, but petitioner "deserved any praise that I can bestow on him."  He noted he would recommend petitioner for any responsible position, with full confidence that petitioner would do an excellent job.  Petitioner's job as lead man made him a supervisor of other prisoner workers, and Livingston wrote:  "[D]irecting an inmate work crew while he was an inmate is difficult due to the factors that authority is fragile and must be handled with great tact" and yet petitioner has accomplished just that "with little difficulty."
> The supervisor in the laundry, Wes Atkinson, also had written letters of support for petitioner.  (footnote omitted).  He wrote that he had insight into petitioner by virtue of their long association, including working with him eight hours a day each weekday since 1997.  Atkinson noted that he had witnessed petitioner go through highs and lows, accepting the lows with "a positive attitude and even temperament" and the highs "with humility and professionalism."  The supervisor stated that over the years he had come to "admire how [petitioner] addresses and overcomes adverse situations that would overwhelm most other persons, free staff (footnote omitted) included," and gave particular examples to prove his point. . . .
> In addition to all his years and experience in the laundry, petitioner had also obtained a vocational certificate showing he was qualified as a forklift operator [In November 2004].  He also has several years experience installing drywall, having been a member of the union.
> The Board noted petitioner's prison disciplinary history, including that his last serious write-up was in 1995.  The Board questioned petitioner about his prison misconduct history.  Petitioner explained that he was young and could not deal with the stress of prison.  He noted that he hadn't

_____

[3]     Citations to the February 2005 decision are omitted.

1    really thought his misconduct was all that serious until he was forced to
     address it by the 1996 Board panel.  He was asked for and made a
2    commitment at that time to stay out of trouble, and he had honored that
     commitment.
3

4        Petitioner next states that the February 2005 panel "reviewed the reports

5    submitted by petitioner's [correctional] counselor D. Cade, noting the counselor's opinion that

6    petitioner would pose 'a minimal degree of threat to the public if released from prison at this

7    time.'"  There appears to be some confusion regarding the report from the correctional counselor.

8    Attached as part of Exhibit H to petitioner's supplemental brief is a "Life Prisoner Evaluation"

9    prepared by Smith for "subsequent parole consideration hearing #7" scheduled for the "October

10   2004 Calendar."  Also attached as part of Exhibit H is a similar report, prepared by Cade, for the

11   "August 2003 Calendar."   While petitioner's counsel indicates Cade, the February 2005 hearing

12   decision references correctional counselor Smith.  However, the decision quotes language from

13   Cade's earlier report, which was considered by the Board in October 2003.  As discussed above,

14   Cade stated that he believed the risk of danger posed by petitioner's release was minimal and he

15   recommended parole.  Smith's more recent report is quite different in that Smith does not assess

16   a threat level and does not specifically recommend release on parole.  Instead, Smith states that,

17   prior to release, petitioner could benefit from "[c]ontinuing his present program."  Thus, it

18   appears that Smith did not agree with Cade and thought that petitioner should remain in prison.

19       Petitioner continues his summary of the February 2005 hearing by discussing the

20   psychological evaluations as follows:

21       The board also reviewed evaluations prepared by prison
     psychologists.  The most recent evaluation, prepared by Dr. Shoemaker,
22   reported that petitioner had no DSM diagnosed mental health illness, that
     he understood his "very bad judgment" in getting involved in criminal
23   conduct, and that he accepted full responsibility for his actions.  In
     assessing petitioner's risk of danger to the community, Dr. Shoemaker
24   opined that despite petitioner's criminal history and prior prison
     misconduct, "[b]ased on the length of time he has spent disciplinary free,
25   his exceptional attitude relating to his work, and his positive and
     reasonable goals he has set for himself in the community, [petitioner]
26   appears to represent a below average risk of dangerousness to others if he

was released to the community." Dr. Shoemaker noted that if petitioner were to use drugs, his risk of dangerousness "may be increased"; thus, he recommended that drug and alcohol abstinence, as well as a steady job, would be critical to maintain petitioner's pro-social gains.

Dr. Mark Hoffman had also written a psychological evaluation for the hearing. Dr. Hoffman noted the positive significance of petitioner being able to remain completely disciplinary free for a decade while in a level four prison. (footnote omitted). The doctor had spoken with other staff members who knew petitioner, including guards; they spoke highly of petitioner, noting his positive programming. Dr. Hoffman concluded:

> On the basis of his disciplinary record and the reports of staff that's cited here, it would seem that this inmate is exceptional and his change in behavior over the last 10 years would indicate a lower than average risk of danger to the community.
>
> [Petitioner does] not have a mental disorder. It appears [he has] made a favorable adaptation to [his] incarceration in that [he has] altered former attitudes of resistance and defiance of authority. [He has] resisted peer pressures to revert to antisocial behavior and used [his] time constructively to improve [his] employability and resistence to criminal influence.

Petitioner next summarized the Board's discussion of his parole plans:

> Petitioner's parole plans were to live with his adult brother in Moreno Valley and to work in the field of laundry, in which he had many years of wide experience. He had many letters of support from family members who expressed willingness to help and support him in any way possible, including providing him with housing and employment.

The Board once again denied parole.[4] In its decision, the Board began by reciting the facts of petitioner's commitment offense, concluding:

> . . . So this was not just merely a robbery. This was a crime that absolutely terrorized these people. And to this day the victim would be in fear of being confronted by anybody every time she saw [a] ski mask, every time she saw a gun, every time she had to go to a dumpster to do her work. . . . So, the commitment offense was paramount to a decision of denying parole.

///

---

[4]     This denial is the subject of the instant action.

10

The board next discussed petitioner's prior criminal and social history, concluding that it demonstrated a "pattern of behavior from this inmate."  Next, the Board considered petitioner's history in prison:

> . . . He has programmed in a limited manner with regards to self-help programs.  He has not sufficiently participated in self-help programs and he has failed [to] demonstrate evidence of positive change.  And it's noted that he's had five 128 counseling chronos with the last one being in October 5th of 2002, for a window covering.  And he does have 10 115s and it is noted the last serious 115 was in 7/6 of '95, approximately 10 years ago.  But the 115s were very serious 115s, physical altercations, he has two of them for attempted stabbing, two of them possession of marijuana, and then another one again for a positive urinalysis in '95, and he has been disciplinary free of 115s since that time.

As to the psychological evaluations by Drs. Hoffman and Shoemaker, the Board stated:

> . . . The . . . psychological reports . . . these reports acknowledge the progress that the inmate has made.  But there's also a report dated June 27th of '02, and that one was authored by Doctor Shoemaker also, and in the current report, Doctor Shoemaker doesn't really say, you know, what changed from his '02 assessment where he said that the prisoner has demonstrated that there is at least some potential risk for dangerousness in the controlled setting.  If there's danger within a controlled setting, then certainly a release to the community would be enhanced by his dangerousness.  It said that the abstinence from drugs and alcohol as well as holding a steady job are critical to maintain pro-social gains thus far.  So it's not a real solid endorsement of his parole suitability and even with the new reports, we would say that these are recent gains by this prisoner.

The Board noted that petitioner's parole plans "appear to be okay."  The Board concluded:

> . . . The prisoner's gains are recent and he must demonstrate an ability to maintain these gains over an extended period of time.  And in view of his assaultive history and his lack of program participation, there is no indication the prisoner would behave differently i[f] paroled. . . .

March 2006 Hearing

According to petitioner, he appeared before the Board for another suitability hearing on March 15, 2006.  The Board again denied parole.  Petitioner states:  "The Board, of course, relied upon the offense, petitioner's juvenile history, and his then eleven-year-old prison disciplinary history."

C.    **State Court Habeas Proceedings**

Following denial of parole in 2005, petitioner sought habeas relief in state court.

In a reasoned decision, the Marin County Superior Court denied the petition, stating:

> At Petitioner's . . . parole consideration hearing on February 9,
> 2005, a two commissioner panel of the Board of Prison Terms (hereafter
> "BPT") . . . unanimously denied parole to Petitioner for one year.  This
> application for a writ of habeas corpus followed. . . .  [¶] . . . If there is
> some evidence to support [the BPT's] decision, the decision will not be
> disturbed on judicial review.  (citation omitted).
>
> There is no question but that the crimes for which Petitioner was
> convicted were serious felonies, as reflected in the sentence he received.
>
> Other salient facts from Petitioner's record include:  Petitioner was
> 18 years old when the above referenced offenses occurred; the victim was
> not physically harmed in the committing offense; since July 1995,
> Petitioner has been disciplinary free; Petitioner has reduced his custody
> level to "Medium" (A) custody, the lowest applicable level in the Level IV
> prison; Petitioner received his G.E.D. in 1997, and significant
> vocational/employment certifications including certified laundry/linen
> manager. . .; and, Petitioner has participated in self help and therapy
> programs including attending AA/NA meeting since the early mid-
> nineties.
>
> In their respective psychiatric assessments of dangerousness, two
> different clinical psychologists from [California State Prison] Sacramento
> state that Petitioner appears to represent "a below average risk of
> dangerousness to others, if he were released to the community"; the Life
> Prisoner Evaluation conducted in May, 2003, recommended his parole; the
> Life Prisoner Evaluation in October 2004, saw no foreseeable problems
> with Petitioner's plan to live with his brother and obtain employment; a
> strong network of family and social support provide a safety net for
> Petitioner; and, Petitioner's expressions of remorse for his past behavior
> have been express[ed] verbally and in writing.
>
> In considering his parole, the BPT, on page 11 of the 2/9/05
> transcript, after review of Petitioner's conduct related to committing the
> crime and Petitioner's progress during his approximate twenty years of
> imprisonment, stated that "the prisoner's gains are recent and he must
> demonstrate an ability to maintain these gains over an extended period of
> time."
>
> The BPT, after finding, on page 12 of the referenced transcript, that
> "these positive aspects of his behavior do not outweigh the factors [of]
> unsuitability," stated that "we're just asking that you remain disciplinary
> free, that you continue with whatever vocational training that you can in
> using the skills that you have acquired, that you participate in whatever
> self help is available, and we will see you in one year."
>
> As such, the transcript reflects that there is "some evidence" to
> support the BPT decision.  Accordingly, the BPT did not violate
> Petitioner's statutory, state, and federal constitutional rights.

The California Supreme Court denied relief without comment.

1

## II.  STANDARDS OF REVIEW

2        Because this action was filed after April 26, 1996, the provisions of the

3   Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") are presumptively

4   applicable.  See Lindh v. Murphy, 521 U.S. 320, 336 (1997); Calderon v. United States Dist. Ct.

5   (Beeler), 128 F.3d 1283, 1287 (9th Cir. 1997), cert. denied, 522 U.S. 1099 (1998).  The AEDPA

6   does not, however, apply in all circumstances.  When it is clear that a state court has not reached

7   the merits of a petitioner's claim, because it was not raised in state court or because the court

8   denied it on procedural grounds, the AEDPA deference scheme does not apply and a federal

9   habeas court must review the claim de novo.  See Pirtle v. Morgan, 313 F.3d 1160 (9th Cir.

10  2002) (holding that the AEDPA did not apply where Washington Supreme Court refused to reach

11  petitioner's claim under its "relitigation rule"); see also Killian v. Poole, 282 F.3d 1204, 1208

12  (9th Cir. 2002) (holding that, where state court denied petitioner an evidentiary hearing on

13  perjury claim, AEDPA did not apply because evidence of the perjury was adduced only at the

14  evidentiary hearing in federal court); Appel v. Horn, 250 F.3d 203, 210 (3d Cir.2001) (reviewing

15  petition de novo where state court had issued a ruling on the merits of a related claim, but not the

16  claim alleged by petitioner).  When the state court does not reach the merits of a claim,

17  "concerns about comity and federalism . . . do not exist."  Pirtle, 313 F. 3d at 1167.

18         Where AEDPA is applicable, federal habeas relief under 28 U.S.C. § 2254(d) is

19  not available for any claim decided on the merits in state court proceedings unless the state

20  court's adjudication of the claim:

21                  (1) resulted in a decision that was contrary to, or involved an
                unreasonable application of, clearly established Federal law, as determined
22              by the Supreme Court of the United States; or

23                  (2) resulted in a decision that was based on an unreasonable
                determination of the facts in light of the evidence presented in the State
24              court proceeding.

25  28 U.S.C. § 2254(d); see also Penry v. Johnson, 532 U.S. 782, 792-93 (2001); Williams v.

26  Taylor, 529 U.S. 362 (2000); Lockhart v. Terhune, 250 F. 3d 1223, 1229 (9th Cir. 2001).  Thus,

1 under § 2254(d), federal habeas relief is available where the state court's decision is "contrary to"

2 or represents an "unreasonable application of" clearly established law.  Under both standards,

3 "clearly established law" means those holdings of the United States Supreme Court as of the time

4 of the relevant state court decision.  See Carey v. Musladin, 127 S.Ct. 649, 653-54 (2006).

5 "What matters are the holdings of the Supreme Court, not the holdings of lower federal courts."

6 Plumlee v. Masto, 512 F.3d 1204 (9th Cir. Jan. 17, 2008) (en banc).  Supreme Court precedent is

7 not clearly established law, and therefore federal habeas relief is unavailable, unless it "squarely

8 addresses" an issue.  See Moses v. Payne, ___ F.3d ___ (9th Cir. Sept. 15, 2008) (citing Wright

9 v. Van Patten, 128 S.Ct. 743, 746 (2008)).  For federal law to be clearly established, the Supreme

10 Court must provide a "categorical answer" to the question before the state court.  See id.; see also

11 Carey, 127 S.Ct at 654 (holding that a state court's decision that a defendant was not prejudiced

12 by spectators' conduct at trial was not contrary to, or an unreasonable application of, the Supreme

13 Court's test for determining prejudice created by state conduct at trial because the Court had

14 never applied the test to spectators' conduct).  Circuit court precedent may not be used to fill

15 open questions in the Supreme Court's holdings.  See Carey, 127 S.Ct. at 653.

16       In Williams v. Taylor, 529 U.S. 362 (2000) (O'Connor, J., concurring, garnering a

17 majority of the Court), the United States Supreme Court explained these different standards.  A

18 state court decision is "contrary to" Supreme Court precedent if it is opposite to that reached by

19 the Supreme Court on the same question of law, or if the state court decides the case differently

20 than the Supreme Court has on a set of materially indistinguishable facts.  See id. at 405.  A state

21 court decision is also "contrary to" established law if it applies a rule which contradicts the

22 governing law set forth in Supreme Court cases.  See id.  In sum, the petitioner must demonstrate

23 that Supreme Court precedent requires a contrary outcome because the state court applied the

24 wrong legal rules.  Thus, a state court decision applying the correct legal rule from Supreme

25 Court cases to the facts of a particular case is not reviewed under the "contrary to" standard.  See

26 id. at 406.  If a state court decision is "contrary to" clearly established law, it is reviewed to

determine first whether it resulted in constitutional error.  See Benn v. Lambert, 293 F.3d 1040, 1052 n.6 (9th Cir. 2002).  If so, the next question is whether such error was structural, in which case federal habeas relief is warranted.  See id.  If the error was not structural, the final question is whether the error had a substantial and injurious effect on the verdict, or was harmless.  See id.

State court decisions are reviewed under the far more deferential "unreasonable application of" standard where it identifies the correct legal rule from Supreme Court cases, but unreasonably applies the rule to the facts of a particular case.  See id.; see also Wiggins v. Smith, 123 S.Ct. 252 (2003).  While declining to rule on the issue, the Supreme Court in Williams, suggested that federal habeas relief may be available under this standard where the state court either unreasonably extends a legal principle to a new context where it should not apply, or unreasonably refused to extend that principle to a new context where it should apply.  See Williams, 529 U.S. at 408-09.  The Supreme Court has, however, made it clear that a state court decision is not an "unreasonable application of" controlling law simply because it is an erroneous or incorrect application of federal law.  See id. at 410; see also Lockyer v. Andrade, 123 S.Ct. 1166, 1175 (2003).  An "unreasonable application of" controlling law cannot necessarily be found even where the federal habeas court concludes that the state court decision is clearly erroneous.  See Lockyer, 123 S.Ct. at 1175.  This is because ". . . the gloss of clear error fails to give proper deference to state courts by conflating error (even clear error) with unreasonableness."  Id.  As with state court decisions which are "contrary to" established federal law, where a state court decision is an "unreasonable application of" controlling law, federal habeas relief is unavailable if the error was harmless.  See Benn, 283 F.3d at 1052 n.6.

The "unreasonable application of" standard also applies where the state court denies a claim without providing any reasoning whatsoever.  See Himes v. Thompson, 336 F.3d 848, 853 (9th Cir. 2003); Delgado v. Lewis, 233 F.3d 976, 982 (9th Cir. 2000).   Such decisions are considered adjudications on the merits and are, therefore, entitled to deference under the AEDPA.  See Green v. Lambert, 288 F.3d 1081 1089 (9th Cir. 2002); Delgado, 233 F.3d at 982.

The federal habeas court assumes that state court applied the correct law and analyzes whether

the state court's summary denial was based on an objectively unreasonable application of that

law.  See Himes, 336 F.3d at 853; Delgado, 233 F.3d at 982.


## III.  DISCUSSION

In his pro se petition, petitioner raises the following claims:

| | |
|---|---|
| Ground One | The State of California, via it's Board of Prison Terms, failed to give petitioner's application for parole real due consideration on suitability for parole and the present evidence supporting that the petitioner is no longer an unreasonable risk of danger to society if release from prison. |
| Ground Two | . . . [T]he . . . Board of Prison Terms failed to set petitioner's "20" year period of confinement, subjecting petitioner to excessive punishment. |
| Ground Three | On Four (4) separate parole consideration hearings . . . the Board of Prison Terms failed to set petitioner's indeterminate primary term at less than the maximum of life within a reasonable time. |
| Ground Four | The . . . Board of Prison Terms failed/refused, at each of petitioner's parole consideration hearings, to perform a mandatory duty to conduct a proportionality analysis on petitioner's term for kidnap/robbery suing the appropriate guideline matrix's in CCR, Title 15, Div. 2. |
| Ground Five | On (February 9, 2005) the . . . Board of Prison Terms continuously and knowingly kept engaging in the manipulating and circumventing of the statutes governing the California Penal Code of imprisonment and parole and procedures with an abusive and oppressive intent to deliberately oppress petitioner of his civil liberty and to deprive him of his freedom. |

Upon appointing counsel for petitioner, the court provided petitioner, through counsel, an

opportunity to file a supplemental memorandum "addressing the merits of the claims raised in

the petition."  In the supplemental memorandum, counsel addresses one issue – whether the

February 2005 denial of parole violated due process.  Therefore, this is the only issue before the

court.  In their original and supplemental answer, respondents raise the following arguments:  (1)

1  petitioner does not have a cognizable liberty interest in parole; (2) even if he does, federal habeas

2  relief is unavailable because there is no clearly established Supreme Court precedent; and (3)

3  even if petitioner has a liberty interest in parole and clearly established Supreme Court precedent

4  requires that the Board's decision be based on "some evidence," this standard was met.

5  **A.    Applicable Law**

6  In Sass v. Bd. of Prison Terms, 461 F.3d 1123 (9th Cir. 2006), the Ninth Circuit

7  held that California's parole statute does, in fact, create a federally cognizable liberty interest.

8  See id. at 1127-28.  On the merits, the court also rejected the argument that the "some evidence"

9  standard does not apply in the parole context.  See id. at 1128-29.  Under Superintendent v. Hill,

10  472 U.S. 445, 455 (1985), due process requires that a prison disciplinary hearing decision be

11  based on "some evidence" in the record as a whole which supports the decision.  This standard,

12  which the court has also applied in the parole context, is not particularly stringent and is satisfied

13  where "there is any evidence in the record that could support the conclusion reached."  Id. at 455-

14  56.  Additionally, this standard requires that the evidence underlying the Board's decision must

15  have some indicia of reliability.  See Biggs v. Terhune, 334 F.3d 910, 915 (9th Cir. 2003).

16  In Sass, the Ninth Circuit also addressed the argument that the requirement of

17  "some evidence" in the parole context has not been clearly established by the Supreme Court.

18  The Ninth Circuit held:

19  Hill's some evidence standard is minimal, and assures that "the
record is not so devoid of evidence that the findings of the . . . board were

20  without support or otherwise arbitrary."  (citation omitted).  Hill held that
although this standard might be insufficient in other circumstances, "[t]he

21  fundamental fairness guaranteed by the Due Process Clause does not
require courts to set aside decisions of prison administrators that have

22  some basis in fact."  (citation omitted).  To hold that less than the some
evidence standard is required would violate clearly established federal law

23  because it would mean that a state could interfere with a liberty interest –
that in parole – without support or in an otherwise arbitrary manner.  We

24  therefore reject the state's contention that the some evidence standard is
not clearly established in the parole context.

25  Sass, 461 F.3d at 1129.

26

1   Because Sass and Biggs are binding precedent, this court must also concluded the "some

2   evidence" standard is clearly established law for purposes of habeas corpus relief under AEDPA.[5]

3   Therefore, this court will apply the "some evidence" standard on the merits.  See id.; see also

4   Irons v. Carey, 505 F.3946, 851 (9th Cir. 2007).

5          In assessing whether the "some evidence" standard has been met, the analysis is

6   framed by the state's statutes and regulations governing parole suitability.  See Biggs, 334 F.3d at

7   915.  Thus, this court looks to California law to determine the findings that are necessary to deem

8   a prisoner unsuitable for parole and then reviews the record to determine whether there is "some

9   evidence" supporting the decision to deny parole.  Under California Penal Code § 3041(b) and

10  California Code of Regulations, Title 15, § 2402(a), once the inmate has served the minimum

11  term required, a release date shall be set unless release currently poses an unreasonable risk of

12  danger to society.[6]  It follows from this that, even though there may be some evidence that a

13  particular unsuitability factor exists, this does not necessarily mean that there is some evidence of

14  / / /

15

16          [5]    The court is aware of the Ninth Circuit's holding in Hayward, 512 F.3d 536,
    rehearing en banc granted, 527 F.3d 797, where the court applied the "some evidence" standard
17  as clearly established law and concluded that habeas relief was granted because the continued
    reliance on immutable factors violated due process.  However, that case is not binding precedent
18  pending issuance of the mandate.  See Hayward, 527 F.3d 797 ("The three-judge panel opinion
    shall not be cited as precedent by or to any court of the Ninth Circuit").  Among the issues being
19  considered on rehearing is whether there is any clearly established law in the parole context.  If
    the Ninth Circuit ultimately concludes that there is no clearly established law, habeas relief
20  would be unavailable.  See Moses v. Payne, ___ F.3d ___ (9th Cir. Sept. 15, 2008) (citing Wright
    v. Van Patten, 128 S.Ct. 743, 746 (2008)).

21          [6]    The regulations set forth various circumstances which tend to show suitability and
    others which tend to show unsuitability.  See Cal. Code Regs., tit 15 § 2402(c)-(d).  Under
22  § 2402(c), circumstances tending to show unsuitability include: (1) the facts of the commitment
    offense, where the offense was committed in an especially heinous, atrocious, or cruel manner;
23  (2) the prisoner's previous record of violence; (3) a history of unstable relationships with others;
    (4) commission of sadistic sexual offenses; (5) a lengthy history of severe mental problems
24  related to the offense; and (6) serious misconduct while in prison.  Circumstances tending to
    show suitability include: (1) lack of a juvenile record; (2) reasonably stable relationships with
25  others; (3) the prisoner has shown remorse; (4) lack of significant history of violent crimes;
    (5) realistic plans for release; and (6) participation in institutional activities indicating an
26  enhanced ability to function within the law upon release.  See Cal. Code Regs., tit. 15 § 2402(d).

1   a current unreasonable risk of danger to the community if the inmate is released.[7]

2          In addition to concluding that due process requires "some evidence" in the parole

3   context based on <u>Hill</u>, the Ninth Circuit has addressed whether the continued reliance on

4   immutable factors satisfies this standard and whether continued reliance solely on such factors

5   ignores the goal of rehabilitation and violates due process.  In <u>Biggs</u>, where the petitioner was

6   challenging the first denial of parole based solely on the facts of the commitment offense, the

7   Ninth Circuit concluded that the denial was based on some evidence – the facts of the

8   commitment offense – even though other findings made by the Board in Biggs' case lacked

9   evidentiary support.  In dicta, however, the court acknowledged that, sometime in the future, the

10  continued reliance on immutable factors could violate due process.  <u>See</u> <u>Biggs</u>, 334 F.3d at 917.

11  From this, it is clear that the Board may rely solely on immutable factors for the first denial of

12  parole given the minimal passage of time between the commitment offense and parole decision.

13         As to subsequent denials of parole and the continued reliance on immutable

14  factors, the Ninth Circuit has not drawn any bright line.  In <u>Sass</u>, where the petitioner was

15  challenging the third denial of parole, the Ninth Circuit affirmed the denial of the habeas petition.

16  <u>See</u> <u>Sass</u>, 461 F.3d at 1129.  The court did not conclude that reliance on immutable factors (the

17  facts of the commitment offense and the petitioner's prior criminal history) – even for a third

18  time – violated due process.  <u>See</u> <u>id.</u>  The court held:

19                 In making a judgment call based on evidence of pre-conviction
                   recidivism and the nature of the conviction offense, the Board cannot be
20                 categorized as acting arbitrarily.  Here, the Board based its finding that
                   Sass was unsuitable for parole on the gravity of his convicted offenses in
21                 combination with his prior offenses.  These elements amount to some
                   evidence. . . .  Consequently, the state court decisions upholding the
22                 denials were neither contrary to, nor did they involve an unreasonable
                   application of, clearly established Federal law as determined by the

23

24         [7]     The California Supreme Court has held that, under the regulations, the denial of
    parole may be predicated on the commitment offense only where the Board can point to factors
25  beyond the minimum elements of the crime that demonstrate that, at the time of the suitability
    hearing, the inmate will present an unreasonable risk of danger to society if released.  <u>See</u> <u>In re</u>
26  <u>Dannenberg</u>, 34 Cal.4th 1061, 1071 (2005).

1    Supreme Court of the United States.

2         Id.

3         In Irons v. Carey, 505 F.3d 846 (9th Cir. 2007), rehearing en banc denied, 505

4    F.3d 951 (9th Cir. 2007), the Ninth Circuit reversed the district court's grant of a habeas petition

5    challenging the eighth denial of parole, concluding that the facts of the petitioner's commitment

6    offense alone constituted some evidence of unsuitability under California law.  The court in Irons

7    noted that none of the Ninth Circuit's cases regarding reliance solely on immutable factors to

8    deny parole involved inmates who had served the minimum terms of their sentences.

9    Specifically, the court observed:

10             We note that in all the cases in which we have held that a parole
        board's decision to deem a prisoner unsuitable for parole solely on the
11       basis of his commitment offense comports with due process, the decision
        was made before the inmate had served the minimum number of years
12       required by his sentence.  Specifically, in Biggs, Sass, and here, the
        petitioners had not served the minimum number of years to which they had
13       been sentenced at the time of the challenged parole denial by the Board.
        Biggs, 334 F.3d at 912; Sass, 461 F.3d at 1125.  All we held in those cases
14       and all we hold today, therefore, is that, given the particular circumstances
        of the offenses in these cases, due process was not violated when these
15       prisoners were deemed unsuitable for parole prior to the expiration of their
        minimum terms.

16
         Id. at 853-54.
17

18   As to the continued reliance solely on immutable factors, the court noted in dicta:

19             Furthermore, we note that in Sass and in the case before us there
        was substantial evidence in the record demonstrating rehabilitation.  In
20       both cases, the California Board of Prison Terms appeared to give little or
        no weight to this evidence in reaching its conclusion that Sass and Irons
21       presently constituted a danger to society and thus were unsuitable for
        parole.  We hope that the Board will come to recognize that in some cases,
22       indefinite detention based solely on an inmate's commitment offense,
        regardless of the extent of his rehabilitation, will at some point violate due
23       process, given the liberty interest in parole that flows from the relevant
        California statutes.
24
         Id. at 854.
25

26   / / /

20

1    From <u>Biggs</u>, <u>Sass</u>, and <u>Irons</u> the court can conclude that, where the challenged

2 parole denial occurs before the petitioner has served the minimum term of his sentence, the

3 continued reliance solely on immutable factors to deny parole for up to eight times does not

4 violate due process.  It may be that, so long as the inmate has not served his minimum sentence,

5 the Board may deny parole any number of times based solely on immutable factors.[8]  Where the

6 inmate has served the minimum term, the following rules apply:  (1) California law creates a

7 liberty interest in parole for prisoners who have served the minimum sentence, <u>see</u> <u>Sass</u>, 461 F.3d

8 at 1127-28; <u>Irons</u>, 505 F.3d at 853-54; (2) the Board's decision to deny parole must be supported

9 by  "some evidence" that the prisoner's release would have posed an unreasonable risk of danger

10 to the community at the time, <u>see</u> <u>Sass</u>, 461 F.3d at 1128-29; and (3) the evidence relied upon by

11 the Board must have some indicia of reliability, <u>see</u> <u>Biggs</u>, 334 F.3d at 915.  In some cases where

12 the minimum term has been served, the continued reliance on immutable factors to deny parole

13 may violate due process.  <u>See</u> <u>id.</u> at 917; <u>see also</u> <u>Irons</u>, 505 F.3d at 854.

14    **B.    <u>Analysis</u>**

15    Based on the principles discussed above, the question for this court is whether the

16 state court's determination that the Board's decision was based on "some evidence" of a risk of

17 danger to the community in 2005 is an unreasonable application of this standard.[9]  Petitioner

18 argues that there is no evidence that, at the time of the Board's February 2005 decision, his

19 release would have posed an unreasonable risk of danger to the community.  As to the

20 unchanging facts of petitioner's commitment offense and prior criminal and social history,

21 petitioner asserts that neither the state court nor the Board ever discussed how those facts relate

22 to any danger his release in 2005 would have posed.  Similarly, petitioner contends that his

23

24    [8]    Such a reading of the cases would be consistent with California law, which does not require that a parole release date even be considered until the inmate has served the minimum

25 term of his sentence.  <u>See</u> Cal. Penal Code § 3041(b) and Cal. Code of Regs., Title 15, § 2402(a).

26    [9]    Because the state court applied the correct rule (i.e., the "some evidence" test), the "contrary to" standard of review does not apply.

prison disciplinary history, which indicated he had not violated any disciplinary rule since 1995,

did not indicate any danger his release would have posed in 2005.  As to programming and the

psychological evaluations, petitioner argues that he had been rehabilitated by February 2005 and,

as such, there was not "some evidence" of danger to society at that time.  Specifically, petitioner

argues:

> The fact that most life prisoners are eligible for parole after serving some minimum number of years in prison shows that the California Legislature believed that people can, and most often do, change over time. And the fact that one convicted of kidnaping is eligible for parole in as few as seven years shows that the Legislature believed that seven years is sufficient time to assess a prisoner's threat to public safety, to see if he has changed from the person who committed the offense. There is no question that at the time of the commitment offense and for the next ten years, petitioner was a threat to public safety. But there is also no question that petitioner has changed.
>
> Petitioner's change was apparent by every piece of evidence before the Board in 2005. That evidence showed that petitioner made a commitment to Commissioner Baker in 1996 and he kept it, not just in terms of staying out of trouble but also in terms of bettering his life. He improved himself educationally and vocationally. He committed himself wholeheartedly to a Twelve Step program and is committed to continuing that program upon release. He took up a role of responsibility and leadership at his job and with his family. He maintained strong family relationships. And he sustained that change for a decade within the chaos, violence, and stress of a maximum security prison. He is unlikely to ever find anything in the community more difficult than surviving in that environment. If he can live within the Level IV environment for more than a decade without being a danger to anyone and indeed being a positive force and a role model, there can be no doubt that he can live in the community without being a danger.
>
> It is clear the Board believed petitioner has changed. How could it not? Many prison staff have attested to his sustained change[], from work supervisor to housing staff to psychologists. These are people who know petitioner well, some who spend hours with him every day. These are people who knew petitioner before he changed: they know what he was like before and yet have no doubt about how different he genuinely is now. These are people who do not easily or often come forward to support a life prisoner's parole, some of them have never been willing to do that for any other prisoner. There is no basis for doubting their evaluation of petitioner. Certainly their opinions are more informed than those of the Board members, who spend only an hour with petitioner once a year.
>
> For years the Board has recognized and commended petitioner for his change. For years petitioner has done everything the Board has ever recommended he do. But the Board continues to find him unsuitable for parole based on static factors that can never change: the commitment offense, his juvenile history and his prison disciplinary history. In light of

petitioner's proven and sustained change, those historical facts no longer have any relevance in determining whether he is a threat to public safety, and the Board has failed to link these facts in any way to current dangerousness. . . .

It may be that three years of change or five years of change were not sufficient to determine whether petitioner could sustain that change over the long run.  But by 2005, petitioner's actions and changed character had been consistent for over a decade, and many people who knew him well . . . attested to that change.  Surely, it had become reasonable to assess his potential threat to public safety based on the most recent decade, and unreasonable to assess it based on events that took place so many years earlier.  And if a decade of consistent conduct, maturation, and growth is not sufficient to be reasonably certain that he posed no threat to the public safety, then what number of years would be?  Would 15 years be sufficient?  20?  While the difference between one and five years may be reasonably related to a concern for public safety, the difference between ten years and fifteen years is just arbitrary.

One of the problems with static factors . . . outweighing years of consistent conduct is that it turns the entire parole scheme on its head.  Unsuitability is presumed instead of suitability being presumed as set out in the statute.  The minimum eligible parole dates established by the Legislature are meaningless.  The factors set forth by the regulations to guide the assessment of suitability are irrelevant.  The determination of threat to public safety is supplanted by a determination of how horrible the crime and the prisoner's past behavior are.  Periodic hearings are just for show because the static factors can never change.  The Board's own matrices, which include applicable terms for the most aggravated murders and kidnaps, are useless and meaningless.  And the Board assumes the legislative role in converting life with parole sentences into life without parole sentences for crimes it determines are "horrendous."

It is impossible to look at the evidence before the Board and have any reasonable concern that petitioner presents a threat to public safety.  And despite the Board's finding that petitioner remained a danger to the community, it appears that was not the reason for the Board's action.  During the hearing, the Board raised no areas of current concern with petitioner; indeed, it noted his employment skills and realistic parole plans, his exceptional job reviews, his character references from prison staff, his participation in self-help programs, and a positive psychological evaluation.  Nor is it reasonable to accept that the Board believes this kidnaping was such an atrocious offense that it makes petitioner a threat twenty years later, especially when the Board has told him before that this is not a crime like that and especially when the Board paroled petitioner's accomplice.  Rather it appears that the Board is punishing petitioner for his years of misconduct.  The Board has often referred to "the big hole" petitioner dug for himself with his prison misconduct and told him that he has to make up for that.  But suitability is not legally based on "making up" for or being punished for the offense or any other misconduct; it is legally based solely on whether the prisoner is a current threat to public safety.  Once a prisoner has served the minimum term before he becomes eligible for parole, the length of time he has been in custody, or been behaving in custody, is not even relevant to the suitability determination.

(footnote omitted).

There is absolutely no evidence that supports the Board's finding that petitioner is a current threat to public safety. Indeed, every piece of evidence for more than a decade establishes just the opposite. The Board's finding violates due process.

In their original answer, respondents address the state court's application of the "some evidence" standard. Respondents acknowledge that the state court relied on the Board's analysis of unchanging factors. Respondents add:

The superior court also considered McCray's prison conduct as a factor favoring unsuitability. (Ex. D, 4.); S*ee* Cal. Code Regs. tit. 15, § 2402(d)(9) (behavior in prison is an indicator of an inmate's ability to function within the law upon release). McCray has received 10 rules violations for misconduct that includes multiple incidents of attempted stabbing and physical altercation. (Ex. B, 74-75). The last reported rules violation occurred in 1995. (*Id*. at 74). In other words, the first ten years of McCray's prison term is marked by his continued violence toward others and a failure to adjust his behavior to avoid misconduct. Thus, as the Board points out and the superior court notes, McCray's gains are recent and need to be sustained consistently over more time before he can be deemed suitable for parole. (*Id*. at 76).

In their supplemental answer, respondents argue:

To the extent that McCray challenges the Board's decision on the grounds that the Board violated his rights by continuing to rely on his commitment offense to deny parole, this claim is without merit for several reasons. McCray relies on *Biggs v. Terhune*, 334 F.3d 910 (9th Cir. 2003).

First, in *Biggs*, the Ninth Circuit suggested that continued reliance on an inmate's commitment offense or other "unchanging factors" alone would raise due process concerns. *Biggs*, 334 F.3d at 916-17. But here, the Board did not rely solely on "unchanging factors." Aside from the crime, the Board also relied on McCray's need for further self-help and failure to demonstrate evidence of positive change. (Ex. C, p. 74). The Board also relied on McCray's disciplinary history even though his last disciplinary was ten years prior, finding that the disciplinaries were very serious. (Ex. C, pp. 74-75). Thus, the *Biggs* dicta is irrelevant. Second, the Ninth Circuit recently disavowed its *Biggs* dicta:

Sass contends that reliance on this immutable behavioral evidence [nature of the conviction offense] violates due process. While upholding an unsuitability determination based on these same factors, we previously acknowledged that "continued reliance in the future on an unchanging factor, the circumstances of the offense and conduct prior to imprisonment, runs contrary to

24

rehabilitative goals espoused by the prison system
and *could* result in a due process violation" *Biggs*,
334 F.3d at 917 (emphasis added). Under AEDPA it
is not our function to speculate about how future
parole hearings could proceed. *Cf. id.*

*Sass*, 461 F.3d at 1129.

Further, in *Sass*, the Ninth Circuit concluded that, "evidence of
Sass' prior offenses and the gravity of his convicted offenses constitute
some evidence to support the Board's decision" at his third hearing. *Id.*
This too is the case here.

The Ninth Circuit's recent decision in *Irons v. Carey*, 479 F.3d 658
does not change the analysis.  First, the *Irons* panel misconstrued the
significance of the *Biggs* [dicta], suggesting it was a holding, rather than
acknowledging that it is merely dicta.  *Irons*, 479 F.3d at 664 ("we held");
*see Kunkler v. Muntz*, 2007 WL 683970 (9th Cir., Mar. 7, 2007) (reversing
a district court decision that had relied on the *Biggs* dictum to grant a
petition based on the governor's reliance on the inmate's crime and
criminal history).  (footnote omitted).  Second, and more importantly, as in
*Sass*, the *Irons* court upheld the Board's decision, despite the fact that it
was based primarily on the commitment offense.  *Irons*, 479 F.3d at 664-
65.  In any event, the Board did not rely solely on McCray's crimes here;
they also expressed concern with his need for further self-help programing
and his serious disciplinary history.

The court agrees with petitioner that there is no question that he has changed

positively over time.  The issue is whether the Board's conclusion that this change was

insufficient to demonstrate that he no longer posed an unreasonable risk of danger in February

2005 was based on "some evidence."  The following summary of the factors – both positive and

negative – noted by the Board in its various decisions shows a definite trend of rehabilitation and

increasing suitability:

       <u>1994</u>  - Facts of the commitment offense;
                   - Prior criminal and social history;
                   - History of disciplinary actions while in prison;
                   - Failure to upgrade educationally and vocationally;
                   - Failure to participate in self-help programs; and
                   - Unfavorable January 1994 psychological evaluation.

       <u>1996</u>  - Facts of the commitment offense;
                   - Prior criminal and social history;
                   - Failure to participate in sufficient self-help programming; and
                   - Recent disciplinary violations.

/ / /

1

2

3

       <u>1998</u>  - Facts of the commitment offense;
                - Prior criminal and social history;
                - Failure to completed a vocation;
                - Obtained GED; and
                - No disciplinary violations since 1995.

4

5

6

7

       <u>2001</u>  - Facts of the commitment offense;
                - Prior criminal and social history;
                - Supporting letters out of date;
                - No disciplinary violations since 1995;
                - Excellent work evaluations;
                - Continued participation in AA and NA; and
                - Positive psychological evaluation.

8

9

10

       <u>2002</u>  - Facts of the commitment offense;
                - Prior criminal and social history;
                - Inconclusive psychological evaluation;
                - No disciplinary violations since 1995;
                - Outstanding work reports;

11

12

13

14

15

16

       <u>2003</u>  - Facts of the commitment offense;
                - Prior criminal and social history;
                - Inconclusive psychological evaluation;
                - Gains were recent;
                - No disciplinary violations since 1995;
                - Continued participation in AA and NA;
                - Correctional counselor recommended parole;
                - Exceptional leadership qualities;
                - Obtained vocational certificates; and
                - Excellent work evaluations.

17

18

19

20

       <u>2005</u>  - Facts of the commitment offense;
                - Prior criminal and social history;
                - Inconclusive psychological evaluations;
                - Gains were recent;
                - Limited self-hep programming;[10]
                - October 2002 counseling chrono;[11] and
                - No disciplinary violations since 1995.

21

/ / /

22

23

24

    [10]     As to programming, the Board found that petitioner had "programmed in a limited manner with regards to self-help programs" and that he had "not sufficiently participated in self-help programs and he . . . failed [to] demonstrate evidence of positive change."

25

26

    [11]     A "128 counseling chrono" documents a minor infraction, as opposed to a "115" which documents a serious disciplinary violation.  According to the Board, petitioner's October 2002 counseling chrono was for a "window covering."

1        Ignoring for the moment the facts of the commitment offense and petitioner's

2   prior criminal and social history – which are immutable factors – the Board in 2005 denied

3   parole primarily because petitioner's gains had been recent.  In particular, the Board stated:  "The

4   prisoner's gains are recent and he must demonstrate an ability to maintain these gains over an

5   extended period of time."  If this statement relates to petitioner's dangerousness in 2005, and if

6   there is "some evidence" to support the statement, then this court would not be able to say that

7   the state court's determination was an unreasonable application of the law.

8        Noting again that petitioner's gains are exceptional, the court nonetheless

9   concludes that the Board's statement that gains were recent is based on "some evidence."

10  Specifically, petitioner had not gained vocational certificates until 2003, just two years before the

11  2005 hearing.  In addition, petitioner's participation in self-help programming was still limited as

12  of 2005.   The court does not agree with petitioner when he states that the Board's finding that

13  his gains were recent is ". . . entirely belied by the evidence in the record of over a decade of

14  maintaining his gains, gains that the superior court itself recognized."  Petitioner focuses on his

15  lack of any disciplinary violations since 1995.  He does not address completion of his vocational

16  training in 2003 or limited self-help programming as late as 2005.   Here, positive and sustained

17  change demonstrating parole suitability encompasses not only being free of serious disciplinary

18  violations.  It also includes completion of vocational and self-help programming.  As petitioner

19  concedes in his supplemental brief, "[i]t may be that three years of change or five years of change

20  were not sufficient to determine whether petitioner could sustain that change over the long run."

21       The remaining question is whether "recent gains" relates to the risk of danger

22  petitioner would have posed to society if he had been released in 2005.  Because petitioner had

23  only obtained vocational certification a few years earlier, and because petitioner had limited self-

24  help programming as late as 2005, the Board could not be certain that petitioner would pose no

25  danger.  The Board required petitioner to sustain his gains over a long period of time.  However,

26  the standard under California law is not whether the Board is certain the inmate will pose no

27

1   danger.  The law only requires that the inmate's release not pose an unreasonable risk of danger

2   to society.  See Cal. Penal Code § 3041(b) and Cal. Code of Regs., Title 15, § 2402(a).  While it

3   is no doubt true that the Board could not be certain and that there was a possibility that petitioner

4   posed a danger to society, neither the Board nor the state court explained how any risk posed by

5   petitioner's release in 2005 was unreasonable.  Releasing a prisoner on parole necessarily always

6   entails some risks.  If the law required the Board to be certain there would be no risk, parole

7   could never be granted.  Recognizing that there is always some risk, California law requires that

8   prisoners be released unless the risk is unreasonable.  Put another way, so long as the inherent

9   risks are reasonable, parole should be granted.

10          In this case, there is simply no evidence in the record that petitioner's release in

11   2005 would have posed an unreasonable risk of danger to society.  To the contrary, petitioner's

12   lack of any serious rules violation in the ten years preceding the 2005 hearing indicates that the

13   risk of dangerousness was entirely reasonable, despite the recent completion of vocational

14   certification and the need to continue with self-help efforts.  Further, as the Board noted in its

15   2005 decision, petitioner ". . .had many letters of support from family members who expressed

16   willingness to help and support him in any way possible, including providing him with housing

17   and employment."  This also supports a conclusion that the risk associated with petitioner's

18   release in 2005 would have been reasonable.

19          Turning to the facts of petitioner's commitment offense and his pre-prison

20   criminal and social history, the court finds that these immutable factors do not speak to

21   petitioner's dangerousness in 2005, especially given his ten-year history of being free of serious

22   rules violations.  As the Ninth Circuit observed in Irons, the continued denial of parole based on

23   immutable factors, regardless of evidence of rehabilitation, will at some point violate due

24   process.  In this case, that point was reached by 2005, at which time any risk of danger to society

25   associated with petitioner's release was reasonable.   While the Board acknowledged petitioner's

26   substantial gains, it appears not to have factored them into its analysis of petitioner's

1   dangerousness as of 2005.

2         The court finds in this case that the denial of parole was arbitrary in light of the

3   facts and, therefore, the denial violated petitioner's right to due process of law.  The court also

4   finds that the state court's denial of petitioner's habeas claim was an unreasonable application of

5   the "some evidence" standard.   In particular, there is no evidence whatsoever in the record which

6   would support the conclusion that petitioner posed an unreasonable risk of danger to the

7   community had he been released in 2005.  To the contrary, the record clearly demonstrates that

8   the risk of danger, if any, was minimal and, therefore, entirely reasonable.  The record

9   demonstrates that, if released, petitioner would have most likely maintained a sober lifestyle,

10   avoided violence, and become a productive member of society.  In short, the record reveals an

11   inmate who had been rehabilitated.

12         The continued reliance on the facts of petitioner's commitment offense and pre-

13   prison criminal and social history – which can never change, despite any efforts petitioner may

14   make – ignores the rehabilitative goal of incarceration where, as here, there was no evidence in

15   2005 that petitioner posed any unreasonable risk of danger if released.  While it certainly satisfies

16   the punitive goal, the state has held out the hope of release upon rehabilitation by providing a

17   parole scheme and by sentencing petitioner to a term less then life with the possibility of parole.

18   If the state truly believed that petitioner's crime was one that warranted a life in prison without

19   hope, it could have provided for that punishment for petitioner's crime or repealed its parole

20   scheme.  But it did not do either of these things.  Instead, the state told him that he could be

21   released on parole if he was no longer a danger to society.  In fact, the state's parole scheme

22   mandates release where the prisoner does not currently pose an unreasonable risk of danger.

23         Petitioner has lived up to his obligation of rehabilitating himself despite the

24   countless obstacles he no doubt faced during his many years in prison.  In failing to live up to its

25   obligation under its own parole scheme, the state has essentially re-sentenced petitioner to life

26   without the possibility of parole.  Not only is this unfair, it seems to the court that the reliance on

1  immutable factors in cases such as this where there has clearly been rehabilitation is not sound

2  public policy.  The State of California currently faces a staggering budget crisis.  In addition,

3  California's prisons are woefully overcrowded.  The state could ease both problems by releasing

4  inmates who have been rehabilitated.  Not only would this reduce the number of inmates in

5  California's prisons, the state would enjoy the cost savings of not having to pay for the prisoner's

6  continued incarceration as well as the potential tax revenue generated by a rehabilitated and

7  productive citizen.

8           While the court recommends that petitioner be granted habeas relief based on

9  violation of his due process rights in 2005, it does not recommend that a release date be set.  As

10 discussed above, parole is appropriate only upon a determination that the inmate does not pose an

11 unreasonable risk of danger to society if released.  If the court were to order a release date, it

12 would be doing so without any determination as to petitioner's current risk because the record in

13 this case ends as of the parole hearing in 2005.  It is possible that petitioner's situation may have

14 changed since then.  For example, petitioner may not now have adequate parole plans.  Or, he

15 may have committed serious rules violations since 2005.  Rather than ordering a release date, the

16 court recommends that the state be required to provide petitioner with a new parole hearing

17 within 30 days of entry of final judgment.

18          Finally, as to respondents' request to stay proceedings, the court's analysis and

19 conclusion does not rely on Hayward, but on cases decided before Hayward.  Therefore, a stay

20 pending issuance of the mandate in Hayward is not necessary.

21 / / /

22 / / /

23 / / /

24 / / /

25 / / /

26 / / /

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

## IV.  CONCLUSION

Based on the foregoing, the undersigned recommends that:

1.      Petitioner's petition for a writ of habeas corpus (Doc. 1) be granted;

2.      Respondents' motion for a stay (Doc. 48) be denied;

3.      Petitioner be provided a parole suitability hearing, to be held within 30 days of entry of final judgment; and

4.      The Clerk of the Court be directed to enter judgment and close this file.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within 20 days after being served with these findings and recommendations, any party may file written objections with the court.  The document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  Failure to file objections within the specified time may waive the right to appeal.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

DATED:  January 27, 2009

CRAIG M. KELLISON
UNITED STATES MAGISTRATE JUDGE